# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

―――――――――――

№ 13-CV-0979 (JFB)

―――――――――――

RAFAEL ACEVEDO LOPEZ,

Plaintiff,

VERSUS

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

―――――――――――

**MEMORANDUM AND ORDER**
September 22, 2014

―――――――――――

JOSEPH F. BIANCO, District Judge:

Plaintiff Rafael Acevedo Lopez ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the Commissioner of Social Security ("defendant" or "Commissioner") denying plaintiff's application for disability insurance benefits. An Administrative Law Judge ("ALJ") found that plaintiff had the residual functional capacity to perform light work, that plaintiff could perform a significant number of jobs in the national economy, and therefore, that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review.

The Commissioner now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff opposes the Commissioner's motion and cross-moves for judgment on the pleadings, alleging that the ALJ erred by failing to accord the proper weight to the opinion of plaintiff's treating physicians.[1]

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is granted to the extent that it seeks a remand. Remand is warranted because the ALJ failed to explain the weight she assigned to the opinion of plaintiff's treating physician, Dr. Marcus, who had been treating plaintiff for nearly ten years at the time of the ALJ's decision. The ALJ stated that she afforded the opinions of Dr. Marcus and other examining physicians "less than weight" without analyzing the required factors, particularly the frequency of treatment and length of the treatment

---

[1] To the extent that plaintiff challenges other aspects of the ALJ's ruling, the Court need not reach them in light of the remand for reconsideration of the weight afforded to plaintiff's treating physician.

relationship, and the consistency of Dr. Marcus's opinion with the clinical findings, the opinions of other examining physicians, and the overall record. Although the ALJ cited other medical evidence which supported her position, she did not apply all of the required factors or specifically explain how that other evidence undermined Dr. Marcus's opinion. Accordingly, a remand for reconsideration of Dr. Marcus's opinion is warranted.

I. BACKGROUND

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. A more exhaustive recitation of the facts is contained in the parties' submissions to the Court and is not repeated herein.

A. Factual Background

1. Plaintiff's Work History and Testimony

Plaintiff was born in 1955 (AR at 168), and attended school in Puerto Rico between the ages of nine and eighteen without receiving a high school degree (*id.* at 892-93). Plaintiff came to the mainland United States in 1978 (*id.* at 781, 888), and held a full-time job as a factory mechanic between April 1981 and December 1999 (*Id.* at 188, 200, 783, 894-95). Plaintiff's employment entailed standing or walking for eight hours a day and lifting up to 50 pounds in a vacuum cleaner bag factory. (*Id.* at 188, 201). Plaintiff stated that he is not fluent in written or spoken English and has not worked since December 6, 1999. (*Id.* at 186, 187.)

On December 6, 1999, plaintiff first sought medical treatment at the emergency department of St. John's Episcopal Hospital for right-sided back pain related to his use of a heavy machine part at work. (*Id.* at 223-27.) Plaintiff was diagnosed with acute low back pain. (*Id.*)

In September and October 2000, plaintiff stated that he had trouble lifting more than fifteen pounds and had trouble walking and standing because of constant lower back pain and stabbing pain travelling down his legs. (*Id.* at 187, 210-11.) Plaintiff took pain medication, but reported that the pain made it difficult to drive a car or perform other household tasks without familial help. (*Id.* at 209, 212.)

Subsequently, in February 2001, plaintiff reported that his condition had deteriorated such that he lost the ability to bend or lift more than five pounds. (*Id.* at 213, 215.) Plaintiff could still take care of his own grooming, but he needed his mother to live in his home to do his chores. (*Id.* at 215, 217.) The interviewer noted that plaintiff's English was sufficient for the interview, but also noted that he was compelled to stand several times while she filled out the report. (*Id.* at 217.)

Afterwards, before ALJ Fier, plaintiff testified that he had been taking Tylenol #3, prescribed by Dr. Marcus, for three or four years and had left the continental United States recently to visit family in Puerto Rico. (*Id.* at 858-62.) Additionally, plaintiff stated he occasionally drove a car to doctor's appointments. (*Id.*) Plaintiff also received $850 per month from Workers' Compensation and refused Dr. Marcus's recommended back surgery because afterwards "you're not the same." (*Id.*)

Before ALJ Hoppenfeld, plaintiff testified that he still drove a car. (*Id.* at 888-91.) Plaintiff stated two prior attempts at physical therapy were not effective. (*Id.* at 902-03.) Plaintiff stated that he could walk

2

one block without reliance on a cane or back brace; however, he could only stand for ten minutes and sit for less than fifteen. (*Id.* at 907-08.) In the most recent supplemental hearing, plaintiff noted that he had only started wearing a back brace in the prior two months. (*Id.* at 785.)

### 2. Plaintiff's Medical History

#### a. Treating Physician (Dr. Marcus)

On December 7, 1999, plaintiff first saw Dr. Marcus, who found tenderness around the sacroiliac region on the right side with a range of motion severely limited by pain despite plaintiff having the ability to heel and toe walk. (*Id.* at 236, repeated at 243, 247, 290.) Dr. Marcus diagnosed sciatic syndrome based on the reported straightening of the lordosis without elimination of disk space, serious joint damage, or other destructive changes. (*Id.* at 236.) Dr. Marcus administered steroids and prescribed Tylenol #3 and Norflex. (*Id.*)

On December 16, 1999, plaintiff told Dr. Marcus his lower back pain was increasing and radiating into the right leg with marked limitation of motion. (*Id.* at 235-36.) While plaintiff's leg was in pain but neurologically intact, however, the diagnosis remained the same, and Lorcet, Norflex, and Lodine were prescribed. (*Id.*) Dr. Marcus stated that plaintiff was unable to work. (*Id.*)

On January 6, 2000, Dr. Marcus examined plaintiff again, and the pain in plaintiff's right leg had subsided but the pain in plaintiff's back persisted with minimal sciatic tenderness. (*Id.* at 240, repeated at 245, 251, 293.) There was, however, tenderness about the sacroiliac region on the right. (*Id.*) Dr. Marcus could not give plaintiff an MRI because of metal shavings in his eye, but a CT scan revealed a herniation of the L4-L5 disc on the right side. (*Id.*) Dr. Marcus recommended physical therapy, prescribed Vicoprofen, and concluded that plaintiff was still unable to work. (*Id.*)

On February 3, 2000 and March 3, 2000, plaintiff told Dr. Marcus that he was again experiencing discomfort in his right leg. (*Id.* at 237, repeated at 248, 291.) Dr. Marcus's recommendations and opinion that plaintiff was disabled and could not return to his prior employment remained unchanged on both occasions. (*Id.*)

Subsequently, Dr. Marcus referred plaintiff to Dr. Phillip Fyman and/or Dr. Alexander Weingarten at Comprehensive Pain Management Associates between March 22 and May 25, 2000. (*Id.* at 452, 515, 529, 532, 534; *see also* 450-51, 514, 527-28, 531, 533 (Workers' Compensation forms).) These physicians administered three lumbar epidural steroid injections to plaintiff. (*Id.* at 452, 515, 529, 532, 534; *see also* 450-51, 514, 527-28, 531, 533 (Workers' Compensation forms).)

On April 17, 2000, Dr. Marcus examined plaintiff after the first two lumbar epidural spinal injections. (*Id.* at 238.) Dr. Marcus found stiffness of the lumbar spine and positive straight leg raising, which was then more pronounced on the right side. (*Id.*)

Dr. Marcus again examined plaintiff in July 2000 and noted that plaintiff had not responded well to steroids, and also noted that straight leg raising was still markedly positive on the right, and there was marked restricted motion of the lumbar spine. (*Id.* at 231, repeated at 234, 288.) Dr. Marcus prescribed Lodine and Lorcet and recommended physical therapy. (*Id.*) Dr. Marcus also opined that plaintiff could not yet work. (*Id.* at 231.)

3

Dr. Marcus, after the x-ray dated September 12, 2000, gave a more complete examination of plaintiff on September 14. (*Id.* at 230, repeated at 233, 287.) Further, on September 20, 2000, Dr. Marcus analyzed plaintiff's sensory and motor skills. (*Id.* at 229 repeated at 241, 286.) Dr. Marcus concluded that plaintiff was otherwise normal except restricted motion, marked spasm, and positive bilateral straight leg raising. (*Id.* at 230, repeated at 233, 287.) Dr. Marcus also noted that plaintiff's pain did not subside while taking painkillers. (*Id.* at 229 repeated at 241, 286.) As described below, Dr. Marcus recommended that plaintiff see a neurosurgeon, which plaintiff did. Dr. Peter Hollis concluded in November 2000 that plaintiff had lumbar pain syndrome, secondary to the same L4-L5 disc herniation which Dr. Marcus had diagnosed. (*Id.* at 266.)

On March 26, 2001, plaintiff returned to Dr. Marcus, who recommended surgery because plaintiff's condition had not improved. (*Id.* at 284.) Dr. Marcus continued to find no change in plaintiff's condition in October of 2001, February of 2002, June of 2002, September of 2002, January of 2003, and April of 2003. (*Id.* at 278-83, 464, 472, 554, 581.) On these occasions, Dr. Marcus repeatedly urged surgery, but plaintiff refused based upon his friends' bad experience with back surgery.[2] (*Id.* at 279, 466, 583.) Dr. Marcus continued to conclude that plaintiff was totally disabled. (*Id.* at 278, 464, 581.) A CT scan in July 2003 showed bulging discs, a large posterior spur, and disc narrowing due to degenerative changes. (*Id.* at 301.)

Plaintiff returned to Dr. Marcus again on August 1, 2003, and reported that his back pain had been "very bad," but he still refused surgery. Dr. Marcus recommended rest as needed and the use of a heating pad. (*Id.* at 277, repeated at 296, 579.) Plaintiff continued to refuse surgery and an epidural injection on November 4, 2003, and Dr. Marcus noted that he remained disabled. (*Id.* at 276, repeated at 295, 597.)

On January 27, 2004, Dr. Marcus noted that plaintiff's pain had extended into plaintiff's cervical spine, but plaintiff still refused surgery. (*Id.* at 275, repeated at 297, 573, 575.) Again, Dr. Marcus found plaintiff to be disabled. (*Id.*) On April 30, 2004, Dr. Marcus completed a questionnaire regarding plaintiff's condition, and opined that plaintiff could lift/carry zero pounds and that he could sit/stand/walk zero hours in an eight-hour workday due to sciatic syndrome. (*Id.* at 289-90.)

On July 21, 2004, Dr. Marcus noted that plaintiff's condition had not definitively changed, and that plaintiff was now reporting pain in his left leg. (*Id.* at 318, 569.) Examination revealed restricted motion of the lumbar spine. (*Id.*) Dr. Marcus also noted that physical therapy had not been authorized despite numerous requests. (*Id.*)

On September 17, 2004 and December 10, 2004, Dr. Marcus noted no change in plaintiff's condition and began prescribing Bextra. (*Id.* at 315-16, 567, 603.) Additionally, Dr. Marcus again requested that plaintiff's health insurance provide physical therapy for plaintiff. (*Id.* at 315, 615.)

On March 2, 2005 and May 9, 2005, Dr. Marcus saw plaintiff again but there was no material change in plaintiff's condition. (*Id.* at 313-14, 599, 601, 661-62.) Dr. Marcus reaffirmed his diagnosis again on July 25,

---

[2] The Court notes that surgery, even if recommended by one's treating physician, is not a prerequisite for disability benefits. *See Poole v. R. Ret. Bd.*, 905 F.2d 654, 664 (2d Cir. 1990).

4

2005, when he found generalized tenderness and mildly positive straight leg raising. (*Id.* at 312, 597, 660.)

Dr. Marcus saw plaintiff again when he sought medical attention, on September 12, 2005, following episodes of sudden weakness in his leg. (*Id.* at 317, 639, 659.) A small sciatic scoliosis was diagnosed, and Dr. Marcus noted that the patient was totally disabled, although he had been attending physical therapy. (*Id.* at 317, 639, 659.) On October 26, 2005, Dr. Marcus's assessment remained unchanged. (*Id.* at 311, 611, 658.) On January 2, 2006, plaintiff reported three more episodes of leg weakness. (*Id.* at 310, repeated at 609, 657.)

Further examination by Dr. Marcus on March 15, 2006, revealed markedly positive straight right leg raising with a positive left cross-response with a marked decrease in lumbar ranges of motion, as well as strong dorsiflexion of the great toe and ankle against resistance. (*Id.* at 604, 658.) Moreover, on May 22, 2006, plaintiff complained of neck pain leading Dr. Marcus to discover marked stiffness of the entire spine with spasm at the paravertebral muscle and positive straight right leg raising with a positive cross response on the left. (*Id.* at 606, 655.)

Consequently, plaintiff returned to Dr. Marcus with numbness in his right leg on August 9, 2006. (*Id.* at 633, 654.) Moreover, examination showed plaintiff was neurologically-intact, but revealed stiffness of the spine with positive straight leg raising leading Dr. Marcus to prescribe Flexeril and Tylenol #3. (*Id.*) On October 6, 2006, Dr. Marcus' diagnosis and prescription were unchanged after examining plaintiff. (*Id.* at 631, 653.)

On December 11, 2006, Dr. Marcus reviewed a recent CT scan and reported no changes in plaintiff's condition. (*Id.* at 629, 652.) Moreover, on February 26, 2007, Dr. Marcus's examination revealed no changes in plaintiff's condition. (*Id.* at 627, 651.)

Subsequent to plaintiff's hernia surgery, Dr. Marcus's examination, on April 25, 2007, showed plaintiff's back was still stiff and characterized by spasm around the paravertebral muscles in the lumbar spine. (*Id.* at 625, 650.) Plaintiff further informed Dr. Marcus, on July 16, 2007, that he was experiencing abdominal pain leading to Dr. Marcus prescribing Vicodin. (*Id.*) Further, on October 5, 2007, Dr. Marcus found that the CT-scan showed "relatively meager findings" regarding plaintiff's injuries leading Dr. Marcus to prescribe Neurontin. (*Id.* at 621, 648.) Dr. Marcus suspected irritation of the sciatic nerve. (*Id.*) On December 5, 2007, plaintiff complained that the Neurontin was not effective leading Dr. Marcus to prescribe Vicodin after examining plaintiff. (*Id.* at 619, 647.)

On March 10, 2008, plaintiff told Dr. Marcus for the first time that he occasionally experienced incontinence of urine and bowel. (*Id.* 616, 645.) Dr. Marcus discussed treatment injections, but plaintiff would not consider them. (*Id.*) Dr. Marcus noted that plaintiff appeared distressed, and he recommended psychiatric evaluation and anti-depressant medication. (*Id.* at 617, 646.) Plaintiff sought and received such treatment. On May 21, 2008, plaintiff returned to Dr. Marcus and continued to complain of occasional bladder and bowel problems with testicular pain. Dr. Marcus's diagnosis remained unchanged. (*Id.* at 615, 642.)

In July 2009, Dr. Marcus wrote a letter to plaintiff's attorney, in which he summarized plaintiff's medical condition and found that plaintiff was totally disabled and unable to return to work since December 16, 1999,

5

while also noting plaintiff's phobia of surgery. (*Id.* at 702-04.) Dr. Marcus provided additional detail in a Medical Source Statement dated July 27, 2009, in which he noted plaintiff's back pain with right leg radiation and incontinence, as well as pain sitting or standing and positive right straight leg raising at 50 degrees, lumbar spasms, an antalgic gait, and muscle weakness of the right lower extremity. (*Id.* at 705-10.) Accounting for the pain and the dizziness and drowsiness caused by the medication and the underlying condition, Dr. Marcus stated that plaintiff could continuously sit for only 30 minutes, stand for only one hour, and walk only 1-2 city blocks without "severe pain." (*Id.* at 707.) During an 8-hour workday, plaintiff would only be able to sit, stand, and walk for 2 hours total, would need to be able to shift positions at will and take unscheduled breaks of 20-30 minutes in length, and would be absent from work more than four times per month. (*Id*. at 708-10.)

### b. Medical Tests

On December 28, 1999, a CT scan revealed lateral right disc herniation at L4-5 and face anthropathy at the lower two lumbar levels. (*Id.* at 264.) This CT scan was later reviewed by Dr. Marcus. On September 12, 2000, plaintiff once more found himself at the St. John's Episcopal Hospital emergency department due to "pins and needles" painful sensations in his left leg, but there were no substantial changes revealed by x-ray. (*Id.* at 308, repeated at 255.)

On July 16, 2003, a CT scan showed bulging discs at the C3-C4, C4-C5, and C5-C6 levels, a large posterior spur at the C6-C7 level, and disc narrowing due to degeneration. (*Id.* at 301.)

On October 16, 2009, a CT scan of plaintiff did not definitively demonstrate a herniated disc. (*Id.* at 767.) Nonetheless, the scan showed bulging of L3-L4, L4-L5, and L5-S1 as well as spina bifida occulta of S1. (*Id.*)

### c. Other Physicians

#### 1. Dr. Young

On March 10, 2000, Dr. Lancelot Young, an orthopedic surgeon, provided plaintiff with an independent medical examination regarding his back pain radiating into the leg. (*Id.* at 429-32, repeated at 482-85, 500-03) However, Dr. Young observed that plaintiff had full (5/5) strength throughout his extremities and a high range of motion. Dr. Young diagnosed lumbrasacral radiculopathy and, like Dr. Marcus, found a herniated disc. (*Id.*) He concluded that plaintiff had a moderate disability and could work in a sedentary position. (*Id.* at 432.)

#### 2. Dr. Fishman

Dr. Fishman, an orthopedic surgeon and independent medical examiner, examined plaintiff, who complained of some generalized paresthesia, on June 20, 2000. (*Id.* at 440-42, 547-49.) Dr. Fishman found that plaintiff was ambulating slowly, had positive straight leg raising on the right at 50 degrees, and had back tenderness but no depressed reflexes and diagnosed plaintiff with lumbrosacral derangement with right radiculopathy. (*Id.*) The doctor concluded that plaintiff had a temporary moderate partial disability, and advised him to consult a neurosurgeon. (*Id.*)

Additionally, Dr. Fishman, on April 10, 2001, noticed that plaintiff ambulated well enough to not use a cane and get on and off the examination table. (*Id.* at 474-76, repeated at 556-58.) Dr. Fishman diagnosed lumbrosacral derangement with right

6

radiculopathy and recommended retraining for a sedentary position due to a temporary moderate partial disability. (*Id.*)

### 3. Dr. Hollis

As mentioned, plaintiff was advised to see a neurosurgeon, and on November 3, 2000, he was examined by neurosurgeon Dr. Peter Hollis. (*Id.* at 266.) Dr. Hollis found significant paraspinal spasm and pelvic tilt, positive bilateral straight leg raising especially on the right, poor deep tendon reflexes, normal gait, motor skills and coordination. (*Id.*) Dr. Hollis concluded (like Drs. Marcus and Young) that plaintiff's symptoms were lumbar pain syndrome secondary to L4-L5 disc herniation that would require lumbar laminectomy, discectomy and instrumented fusion to cure. (*Id.*) Dr. Hollis prescribed Tylenol #3 for the plaintiff's pain. (*Id.*)

### 4. Dr. Villafuente

On November 29, 2000, Dr. Villafuente, a consultant, found that movement intensified plaintiff's pain while medication and BenGay partially relieved plaintiff's pain. (*Id.* at 252.) Plaintiff reported that physical therapy was not working, and that he could only sit for one-half hour and stand for less than 20 minutes. (*Id.*) Dr. Villafuente found that plaintiff had full muscle strength and motion, which allowed him to travel about 150 feet and transfer from sitting to standing. (*Id.*) Plaintiff also had muscle spasms, tenderness, positive right and negative left straight leg raising, a slow gait, and motion caused pain. (*Id.* at 254.) Dr. Villafuente ruled out lumbrosacral radiculopathy. (*Id.*)

### 5. Dr. Kaye and Dr. Malik

On January 5, 2001, state agency medical consultant Dr. Kaye performed a physical residual functional capacity assessment—a file review—and concluded that plaintiff could frequently lift and carry ten pounds, stand and walk at least two hours in an eight-hour workday, and sit about six hours in an eight hour workday. (*Id.* at 257-58.) Therefore, plaintiff was capable of completing sedentary work. (*Id.*) Another non-examining consultant, Dr. Malik, concurred with Dr. Kaye. (*Id.* at 256-63.)

### 6. Dr. Torrents

Plaintiff was examined by Dr. Torrents, a physiatrist, on July 27, 2005, in order to be evaluated for physical therapy. (*Id.* at 590-92, 593-595, 612, 634-37 (Workers' Compensation Forms).) The examination revealed a full range of motion in his joints, full muscle strength in the upper extremities and lower extremities with a normal gait. (*Id.*) However, like Drs. Marcus, Young, and Hollis, Dr. Torrents diagnosed painful lumbar herniated discs, noted sciatic pain, and requested authorization for physical therapy three times per week. (*Id.* at 591-92.) Dr. Torrents also noted that he believed that plaintiff remained "fully disabled." (*Id.*)

After physical therapy, on September 1, 2005, plaintiff told Dr. Torrents his physical pain was unrelieved by therapy. (*Id.* at 587.) Dr. Torrents discovered changed bilateral straight leg raising positive at 70 degrees. (*Id.*) Dr. Torrents also found spinal flexion to 40 degrees, and extension to 20 degrees and for the second time diagnosed total disability from painful sciatica secondary to L4-L5 and L5-S1 herniated discs. (*Id.*) Dr. Torrents followed up by requesting physical therapy authorization and for electromyography (EMG)/nerve conduction study (NCV) to rule out lumbar radiculopathy. (*Id.*)

### 7. Psychiatric Examinations[3]

As noted above, Dr. Marcus recommended in March 2008 that plaintiff see a psychiatrist. Subsequently, on March 24, 2008, Zayne Beckford, MA Intern, at St. John's Episcopal Hospital Community Hospital, evaluated plaintiff. (*Id.* at 727.) Beckford found that he had a Global Assessment of Functioning score of 49, indicating serious symptoms impairing social functioning. (*Id.*) Beckford diagnosed mood disorder due to back injury with major depressive-like episodes. (*Id.*) On April 21, 2008, Dr. Bartha, a psychiatrist, examined plaintiff, who stated his depression started after the September 11, 2001 attacks. Dr. Bartha found plaintiff had a major depressive disorder with psychotic features with a GAF between 51 and 55 (indication moderate or severe difficulty). (*Id.* at 712-13, 736-37.) Dr. Bartha's prescription increased plaintiff's Cymbalta, decreased the Klonopin prescription, and continued Zyprexa and Ambien. (*Id.*)

### 8. Testifying Experts

Several medical experts also testified about plaintiff's condition as part of the proceedings below. Dr. Axline, an orthopedist and medical consultant, reviewed the medical evidence in the record and concluded the plaintiff never had any herniation based on the 2009 CT scan because herniation is a non-curable condition. (*Id.* at 793-94.) Dr. Axline further noted that plaintiff had a high level of neurological functioning (*id.* at 811) and strength and joint functioning (*id.* at 806). Dr. Axline opined that plaintiff could walk, sit, or stand six hours in an eight-hour workday and lift up to 20 pounds. (*Id.* at 805, 808.) Therefore, Dr. Axline concluded, plaintiff was qualified for light work. (*Id.*) Dr. Jonas, a board certified metal health medical consultant, was also called to testify to plaintiff's alleged psychological and mental impairments. Dr. Jonas testified that the 2008 psychiatric complaints were amplified in order to receive benefits. (*Id.* at 829-30.) Further, Dr. Jonas also proffered that plaintiff should have received back surgery because plaintiff underwent hernia surgery, and commented that he believed there were inconsistencies in plaintiff's records. (*Id.* at 827.)

Vocational Expert Andrew Pasternak also testified below, and characterized plaintiff's prior job as a highly skilled position requiring high amounts of exertion. (*Id.* at 834-35.) While Pasternak noted that plaintiff could no longer work as a factory mechanic (*id.* at 834-35), he argued that plaintiff was still sufficiently capable to complete jobs in the local and national economy, such as housekeeper/cleaner, assembler, and machine tender (*id.* at 835-37). Further, Pasternak testified that, even if plaintiff were sedentary, he would be able to work as a preparer or pinker cutter. (*Id.* at 840, referring to 932-33.) However, Pasternak also acknowledged that there were no jobs available which plaintiff could perform if he was limited to the restrictions described in Dr. Marcus's July 2009 letter. (*Id.* at 850.) Pasternak also agreed that there were no jobs plaintiff could perform if he had to take four to five breaks per day. (*Id.*)

---

[3] Plaintiff also argues that the ALJ improperly concluded that there was insufficient evidence of his alleged psychiatric impairments, and did not consider the possibility that the 2008 diagnoses of plaintiff's providers could have been retrospective and thereby extended into the insured period. The records do not suggest a retrospective diagnosis on their face, but the Court need not decide this question. On remand, plaintiff will have the opportunity to enter additional psychiatric evidence.

8

B. Procedural History

Plaintiff applied for disability insurance benefits on October 4, 2000. (AR at 168-170.) The Commissioner denied plaintiff's request and plaintiff subsequently received a hearing before ALJ Seymour Fier on September 24, 2001. (*See id.* 31-32, 36, 63-71.) ALJ Fier found that plaintiff was not disabled. (*Id.* at 33-45.) The Appeals Council vacated ALJ Fier's judgment and remanded the case to further develop the record due to ALJ Fier not contacting Dr. Marcus or considering Dr. Marcus's opinion, or using a vocational expert. (*Id.* at 87-90.)

After a supplemental hearing, ALJ Fier found, again, that plaintiff was not disabled. (*Id.* at 46-60.) The Appeals Council vacated the decision and remanded the case for further development by ALJ Hoppenfeld because of a failure to meet the requirements of the treating physician rule. (*Id.* at 107-10.)

ALJ Hoppenfeld also held that plaintiff was not disabled. (*Id.* at 10.) The Appeals Council vacated the decision and remanded for further proceedings because Dr. Marcus's letter clarifying his prior treatment was new evidence, the ALJ failed to evaluate the weight assigned to a non-testifying consultant, and a lack of development of the ALJ's reasoning regarding plaintiff's mental health claims. (*Id.* at 141-45.) On remand, the ALJ concluded that plaintiff was capable of light work, and not disabled. Afterwards, the Appeals Council denied plaintiff's request for review, (*id. at* 943-46), and this action followed.

II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ only if the decision is based upon legal error or is not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (internal quotations and citations omitted)). Furthermore, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for plaintiff's position. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

III. DISCUSSION

A. Legal Standard

A claimant is entitled to disability benefits under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520(a)(4), 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps while the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner must consider the following in determining a claimant's entitlement to benefits: "(1) the objective medical facts [and clinical findings]; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability . . . ; and (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

### B. Application

In opposing defendant's motion, plaintiff argues that the ALJ's decision is not supported by substantial evidence and is the result of legal error. Specifically, plaintiff argues that the ALJ failed to apply the "treating physician rule" by not giving "controlling weight" to Dr. Marcus's opinion. As set forth below, the Court concludes that the ALJ failed to articulate how much, if any, weight she afforded to Dr. Marcus and failed to explain that weight in terms of the required factors.

#### 1. Substantial Gainful Activity

At step one, the ALJ must determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work activity that involves doing significant physical or mental activities, 20 C.F.R. § 404.1572(a), and gainful work activity is work usually done for pay or profit, 20 C.F.R. § 404.1572(b). Individuals who are employed

10

are engaging in substantial gainful activity. In this case, the ALJ determined that plaintiff had not engaged in any substantial gainful activity since December 6, 1999. (AR at 13.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

2. Severe Impairment

If the claimant is not employed, the ALJ then determines whether the claimant has a "severe impairment" that limits his capacity to work. An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *see also Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). An impairment or combination of impairments is "not severe" when medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. *See* 20 C.F.R. § 404.1521. Based on the opinion of the medical examiners who testified, the ALJ found that plaintiff was not severely impaired. However, as discussed *infra*, the ALJ's failure to apply the treating physician rule requires remand in order to determine whether the same findings are warranted.

3. Listed Impairment

If the claimant has a severe impairment, the ALJ next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(c). In this case, the ALJ found that plaintiff's impairments did not meet any of the listed impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR. at 31.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

4. Residual Functional Capacity and Past Relevant Work

If the claimant does not have a listed impairment, the ALJ determines the claimant's residual functional capacity, in light of the relevant medical and other evidence in the claimant's record, in order to determine the claimant's ability to perform his past relevant work. 20 C.F.R. § 404.1520(e). The ALJ then compares the claimant's residual functional capacity to the physical and mental demands of his past relevant work. 20 C.F.R. § 404.1520(f). If the claimant has the ability to perform his past relevant work, he is not disabled. *Id.* In this case, the ALJ found that plaintiff does not have the residual functional capacity to perform his past relevant work as a mechanic, but that he does have the ability to perform "the full range of light work." (*Id.* at 14, 27.) Plaintiff challenges this conclusion, and it is discussed in more detail *infra*.

5. Other Work

At step five, if the claimant is unable to perform his past relevant work, the ALJ determines whether the claimant is capable of adjusting to performing any other work. 20 C.F.R. § 404.1520(g). To support a finding that an individual is not disabled, the Social Security Administration has the burden of demonstrating that other jobs exist in significant numbers in the national economy that claimant can perform. 20 C.F.R. § 404.1560(c); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Here, the ALJ concluded that plaintiff could have performed a significant number of light-work

jobs. (AR at 28-29), and plaintiff challenges that conclusion.

Plaintiff's primary argument for remand is based on the "treating physician rule," which requires ALJs to give "special evidentiary weight" to the opinion of a treating physician in certain circumstances. *See Clark*, 143 F.3d at 118. The treating physician rule "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see*, *e.g.*, *Rosa*, 168 F.3d at 78–79; *Clark*, 143 F.3d at 118. The rule provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).

However, although treating physicians may share their opinion concerning a patient's inability to work and the severity of disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.") If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Clark*, 143 F.3d at 118 (citation omitted).

When the Commissioner chooses not to give the treating physician's opinion controlling weight, she must "give good reasons in . . . [her] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *see also Perez v. Astrue*, No. 07–cv–958(DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's

medical condition than are other sources."). A failure by the Commissioner to provide "good reasons" for not crediting the opinion of a treating physician is a ground for remand. *See Snell*, 177 F.3d at 133; *Torres v. Comm'r of Soc. Sec.*, No. 13-CV-330(JFB), 2014 WL 69869, at *13 (E.D.N.Y. Jan. 9, 2014).

The issue in this case is whether the ALJ adequately explained what weight, if any, she afforded the opinion of Dr. Marcus when she disagreed with his conclusions concerning plaintiff's limitation. Based on the findings by Dr. Axline and others, the ALJ concluded that plaintiff had the residual functional capacity to perform a range of light work available in the national economy. (AR at 33–35.) Therefore, the ALJ concluded that plaintiff "has not been under a disability at any time through the date of this decision" and was not entitled to benefits. (*Id.* at 35.)

However, the Court concludes that the ALJ did not provide sufficient reasons for rejecting Dr. Marcus's opinion, which she stated was afforded "less than weight." (*Id.* at 26.) Based on this statement, it is simply unclear how much, if any, weight the ALJ assigned to Dr. Marcus, the treating physician, and this ambiguity requires reversal. The Second Circuit has repeatedly noted that an ALJ must "set forth her reasons for the weight she assigns to the treating physician's opinion." *Shaw*, 221 F.3d at 134; *see also Taylor v. Barnhart*, 117 F. App'x 139, 140–41 (2d Cir. 2004) (remanding case because ALJ "did not give sufficient reasons explaining how, and on the basis of what factors, [the treating physician's] opinion was weighed," and stating that "we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion" (internal citation and quotation marks omitted)); *Torres*, 2014 WL 69869, at *13 (finding error where ALJ assigned only "some weight" to opinion of treating physician); *Black v. Barnhart*, No. 01-CV-7825(FB), 2002 WL 1934052, at *4 (E.D.N.Y. Aug. 22, 2002) ("[T]he treating physician rule required the ALJ . . . to clearly articulate her reasons for assigning weights.").

To be clear, the ALJ did not simply use the wrong terminology; her ambiguous language was compounded by an inadequate explanation of her reasoning. Thus, even assuming the ALJ simply left out the word "controlling" (or some other word, when she wrote "less than weight"), remand is still required. In particular, the ALJ did not address certain of the factors required when an ALJ affords a treating source less than controlling weight, despite the Second Circuit's repeated admonitions to do so. For example, the ALJ's opinion does not address "the frequency of examination and the length, nature, and extent of the treatment relationship." *Clark*, 143 F.3d at 118. Dr. Marcus examined, tested, and treated plaintiff every few months for nearly 10 years. In other words, he was "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of . . . medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from . . . reports of individual examinations." *Taylor*, 117 F. App'x at 140; (quoting 20 C.F.R. § 404.1527(d)(2)). Accordingly, the ALJ should have specifically addressed why a relationship of this length did not entitle Dr. Marcus's opinion to controlling weight.

Instead, the ALJ dismissed Dr. Marcus's opinion as worthy of "less than weight" because it was not "couched in vocationally relevant terms." (*Id.* at 26.) Apart from the fact that this critique is vague with respect to the amount of weight afforded, it also appears

to ignore Dr. Marcus's vocational observations on July 27, 2009, when he documented that plaintiff could continuously sit for only 30 minutes, stand for only one hour, and walk only 1-2 city blocks without "severe pain." (*Id.* at 707.) During an 8-hour workday, plaintiff would only be able to sit, stand, and walk for 2 hours total, would need to be able to shift positions at will and take unscheduled breaks of 20-30 minutes in length, and would be absent from work more than four times per month.[4] (*Id.* at 708-10.) These are the exact same type of vocational observations relied upon by Dr. Axline to reach a different conclusion (*cf. id.* at 805), yet the ALJ appears not to have been familiar with Dr. Marcus's vocational findings, despite his long history with plaintiff. Furthermore, Dr. Axline, on whom the ALJ relied, also appeared to be unfamiliar with Dr. Marcus's vocational observations. When asked whether plaintiff could walk and stand six hours in an 8-hour day, Dr. Axline responded that "[t]here's nothing in the record that said he can't" (*id.* at 805), even though Dr. Marcus concluded that plaintiff could only sit, stand, and walk for two hours total in an 8-hour day. Even the vocational expert Pasternak (who the ALJ cited favorably) acknowledged that, if true, Dr. Marcus's findings would prevent plaintiff from working any job. (*Id.* at 850.)

To be sure, the ALJ was correct when she cited Second Circuit precedent for the proposition that "nonexamining sources [such as Dr. Axline] may override treating sources' opinions," but that rule applies only where the evidentiary record supports that conclusion. *Netter v. Astrue*, 272 F. App'x 54, 55-56 (2d Cir. 2008) (internal quotation marks and citations omitted). In other words, the ALJ must be able to point to other aspects of the record that support Dr. Axline's contentions, beyond the contentions themselves. The ALJ suggested that the "objective clinical findings" more strongly supported Dr. Axline and allowed her to afford "less than weight" to Dr. Marcus (AR at 26), but it is entirely unclear which clinical findings she was referring to, or why they were superior to the objective clinical findings recorded by Dr. Marcus. In his July 2009 Medical Source statement, he described the "positive objective signs" of plaintiff's disability as spasm and tenderness around the lumbar spine, antalgic gait, and positive straight leg raising of 50 degrees. (*Id.* at 706.) This last finding is significant because the ALJ incorrectly critiqued Dr. Marcus for not providing a degree measurement of his straight-leg raise test (*id.* at 23), which is yet another indication that she did not afford Dr. Marcus's findings the proper consideration. Furthermore, the ALJ's reliance on Dr. Axline is especially problematic with respect to Dr. Marcus's 2009 Medical Source Statement, because, in his testimony, Dr. Axline only addressed earlier records by Dr. Marcus (*id.* at 801-03, 915-16), and did not discuss the 2009 objective findings and Dr. Marcus's conclusion that plaintiff could not perform the tasks necessary for even sedentary work. Thus, the ALJ's rationale for relying on Dr. Axline—his supposed familiarity with the entire medical record—is flawed with respect to the 2009 evidence demonstrating plaintiff's functional limitations, provided by the same treating physician who had been observing similar limitations for the past 10 years.[5]

---

[4] The 2009 Medical Source Statement shows marginal improvement from plaintiff's functional limitations during the insured period. As noted *supra*, Dr. Marcus concluded in 2004 that plaintiff could lift/carry zero pounds and that he could sit/stand/walk zero hours in an eight-hour workday. (AR at 289-90.)

[5] In her opinion, the ALJ cited two Second Circuit opinions suggesting that the opinions of non-examining sources may override the opinions of treating sources, and this Court does not hold otherwise. However, it does not appear that either of

In deciding not to afford controlling weight to Dr. Marcus's opinion, the ALJ was also required to analyze the opinion's "consistency with the record as a whole." *Clark*, 143 F.3d at 118. However, the ALJ failed to address the fact that Dr. Marcus's conclusions are corroborated to varying degrees by the conclusions of other physicians who examined plaintiff. For example, Dr. Torrents concluded as late as 2005 that plaintiff's painful sciatica and herniated disc left him "fully disabled." (AR at 591-92.) Likewise, Dr. Marcus's observation of positive straight-leg raising is echoed throughout the record, and at least four providers, three of whom examined plaintiff, concluded that he had a herniated disc, based upon the 1999 CT scan. (*Id.* at 240, 264, 266, 432.) Despite this evidence, the ALJ credited Dr. Axline's testimony that there was no herniated disc, because the 2009 CT scan showed "no definitive herniation." (*Id.* at 23.) However, Dr. Axline simply stated as a fact that plaintiff never had a herniated disc, without explaining how all of the other providers could have been wrong. Under these circumstances, the ALJ should have explained why Dr. Axline's opinion about the herniation deserved greater weight than those of multiple physicians who had the benefit of examining plaintiff in person.

Accordingly, on remand, the ALJ must directly address this conflicting evidence and more clearly state the amount of weight afforded to Dr. Marcus and the other examining physicians. There is currently no explanation in the record concerning how the ALJ arrived at her decision to afford "less than weight" to Dr. Marcus, or even what the ALJ meant by that statement. On remand, the explanation must make specific reference to the factors cited above, including the frequency of visits and the length of the relationship between plaintiff and Dr. Marcus, and the consistency between Dr. Marcus's opinion and the entire record.

### IV. REQUEST FOR A NEW ALJ

Plaintiff requests that, in light of the numerous legal errors the ALJ made, a new ALJ be appointed to prevent the denying plaintiff's due process rights. Following the Second Circuit and sister circuits, this district has held that this is permissible relief under circumstances where the ALJ's fundamental impartiality is compromised by his or her previous actions in a case. *Miles v. Chater*, 84 F.3d 1397, 1401 (2d Cir. 1996).

The relevant factors for determining whether a new ALJ should be assigned on remand include: "(1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y 2004).

None of these factors are present here, and given their absence, the Court concludes that "whether a case is remanded to a different ALJ is a decision for the Commissioner to make." *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 222 (E.D.N.Y. 1998).

---

the two cases cited by the ALJ involved a 10-year treatment relationship or the ambiguous language employed by the ALJ here. *See Wells v. Comm'r of Soc. Sec.*, 338 F. App'x 64 (2d Cir. 2009); *Netter v. Astrue*, 272 F. App'x 54 (2d Cir. 2008). Moreover, neither case addresses the failure of the ALJ to discuss vocational findings by the treating physician, as the ALJ failed to do here, despite the fact that she criticized Dr. Marcus's records for lacking vocational terms.

V. Conclusion

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is granted to the extent that it seeks a remand. The case is remanded to the Commissioner for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
Joseph F. Bianco
United States District Judge

Date: September 22, 2014
 Central Islip, NY

\* \* \*

Plaintiff is represented by Sharmine Persaud, 1105 Route 110 Farmingdale, New York and Sarah H. Bohr, Bohr & Harrington, LLC., 2337 Seminole Road, Atlantic Beach, FL 32233. Defendant is represented by Loretta E. Lynch, United States Attorney, Eastern District of New York, by Candace Scott Appleton, 610 Federal Plaza, Central Islip, NY 11722.